# United States Court of Appeals for the Federal Circuit

---

**AMDOCS (ISRAEL) LIMITED,**
*Plaintiff-Appellant,*

v.

**OPENET TELECOM, INC., AND
OPENET TELECOM LTD.,**
*Defendants-Appellees.*

---

2013-1212

---

Appeal from the United States District Court for the Eastern District of Virginia in No. 10-CV-0910, Judge Leonie M. Brinkema.

---

Decided: August 1, 2014

---

S. CALVIN WALDEN, Wilmer Cutler Pickering Hale and Dorr LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were NELS T. LIPPERT; JAMES L. QUARLES, III, GREGORY H. LANTIER, JOSHUA M. SALZMAN, and BRITTANY BLUEITT AMADI, of Washington, DC.

JAMES H. WALLACE, JR., Wiley Rein LLP, of Washington, DC, argued for defendants-appellees. With him on the brief were ANTHONY H. SON, BRIAN H. PANDYA, ERIC H. WEISBLATT, JOSEPH SHIN, and ADRIENNE G. JOHNSON.

———————————

Before NEWMAN, CLEVENGER, and REYNA, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* REYNA.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* NEWMAN.

REYNA, *Circuit Judge.*

This is a patent infringement case on appeal from the United States District Court for the Eastern District of Virginia. Appellant Amdocs (Israel) Limited ("Amdocs") asserted four related patents against Appellees Openet Telecom, Inc. and Openet Telecom Ltd. (collectively "Openet"), seeking damages and injunctions.

Amdocs and Openet compete in the market for "data mediation software," which helps internet service providers ("ISPs"), such as Verizon and AT&T, track their customer's network usage and subsequently generate bills. When a customer sends an email, surfs the internet, sends a text message, or participates in a video conference, records of this network activity ("network records") are generated at various, disparate locations throughout an ISP's network. Data mediation software collects, processes, and compiles these network records so that network usage can be tracked and billed appropriately.

Before the district court, Openet moved for summary judgment of noninfringement of the four patents. With regard to three of the patents, U.S. Patent Nos. 7,631,065 (the "'065 Patent"), 7,412,510 (the "'510 Patent"), and 6,947,984 (the "'984 Patent"), Openet argued that Amdocs was unable to point to actual infringing use and that the accused products did not practice all claim limitations. The district court granted Openet's motion based on its finding that Amdocs did not raise a genuine question of material fact as to whether the accused devices practiced "completing" or "enhance[ing]" "in a distributed fashion,"

a requirement which it construed to be common to all asserted claims. We agree with the court's construction of enhancement and completion but we find that Amdocs' documentary evidence describing the structure and operation of the accused product creates genuine factual issues regarding whether the product meets these constructions. Accordingly, for these three patents, we reverse the district court's grant of summary judgment and remand.

The district court also granted summary judgment of noninfringement of the fourth patent, U.S. Patent No. 6,836,797 (the "'797 Patent"). Because this finding is based on an erroneous claim construction, we vacate and remand for determination of infringement under the proper claim construction.

## I.　Introduction

### A.　The Asserted Patents

The district court provides the following summary of the patented technology:

> All of these patents claim parts of a system that is designed to solve an accounting and billing problem faced by network service providers. Customers of network service providers often use several distinct services, such as e-mail, voice over Internet Protocol, or streaming audio or video, on the same computer network. Because some services require more bandwidth than others, network service providers "would like to price their available bandwidth according to a user's needs," for example by billing business customers "according to their used bandwidth at particular qualities of service." The raw usage logs for these services, however, are generated by several different network devices that may exist in different network levels. The patented system collects these raw usage data records from their diffuse locations

throughout the network and through appropriate filtering, aggregation, correlation, and enhancement transforms them into a format suitable for accounting, called "detail records" ("DRs"). These DRs can then be stored in a central repository for generating "auditing, accounting and billing reports" or "can be sent directly to other systems," including billing systems.

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10-cv-910, 2013 WL 265602, at \*2 (E.D. Va. Jan. 22, 2013) (citations and footnotes omitted) [hereinafter *District Court Op.*]. The four patents are related, but each is directed to a different aspect of the subject matter.

### B.  The '065 Patent

As the district court succinctly summarized, "[t]he '065 patent describes the invention's primary function, which is the collection and transformation of network accounting records." *Id.* at \*3. Amdocs asserts independent claims 1, 7, and 13 and dependent claims 4 and 17.

The asserted claims recite:

1. A computer program product embodied on a computer readable storage medium for processing network accounting information comprising:

> computer code for receiving from a first source a first network accounting record;

> computer code for correlating the first network accounting record with accounting information available from a second source; and

> computer code for using the accounting information with which the first network accounting record is correlated to enhance the first network accounting record.

4. The computer program product embodied on a computer readable storage medium of claim 3,[1] wherein the accounting information is in the form of a second network accounting record.

7. A method of processing network accounting information comprising:

> receiving from a first source a first network accounting record;

> correlating the first network accounting record with accounting information available from a second source; and

> using the accounting information with which the first network accounting record is correlated to enhance the first network accounting record.

13. A system for collecting data from network entities for a data consuming application, comprising:

> a plurality of data collectors to receive information from the network entities and to pro-

---

[1]  Claim 4 depends on unasserted claims 2 and 3, which recite:

2. The computer program product embodied on a computer readable storage medium of claim 1, wherein the enhancement is based on a policy.

3. The computer program product embodied on a computer readable storage medium of claim 2, wherein the accounting information includes parameters and wherein the using comprises adding at least one parameter from the accounting information to the first network accounting record.

duce records based on the information, each data collector in the plurality of data collectors being associated with and coupled to a different one of the network entities; and

an enhancement component that augments data in one of the records produced by one of the plurality of data collectors with data from a different one of the records produced by another of the plurality of data collectors.

17. The system of claim 13, further comprising:

a module coupled to the plurality of data collectors, the module receives the records produced by the plurality of data collectors for aggregation purposes, and wherein the enhancement component resides in the module.

In relevant part, these 5 claims can be generalized as:

- receiving network accounting "record[s]" from different "source[s]" or "data collectors;" and

- "enhanc[ing]" the "record" from a "source" or from a "data collector" with the information.

### C. The '984 and '510 Patents

"The '984 patent and the '510 patent, which is a continuation of the '984 patent, describe methods and computer program products for creating reports based on the generated DRs, and for sending alerts based on those reports. The asserted claims also include limitations that describe in detail the core collection and conversion of network usage records." *District Court Op.* at *3. Amdocs asserts independent claims 1 and 13 and dependent claims 2, 6, and 8 of the '984 Patent, and independent claim 16 and dependent claims 17 and 19 of the '510 Patent.

The asserted '984 Patent claims recite:

1. A method for reporting on the collection of network usage information from a plurality of network devices, comprising:

(a) collecting network communications usage information in real-time from a plurality of network devices at a plurality of layers utilizing multiple gatherers each including a plurality of information source modules each interfacing with one of the network devices and capable of communicating using a protocol specific to the network device coupled thereto, the network devices selected from the group consisting of routers, switches, firewalls, authentication servers, web hosts, proxy servers, netflow servers, databases, mail servers, RADIUS servers, and domain name servers, the gatherers being positioned on a segment of the network on which the network devices coupled thereto are positioned for minimizing an impact of the gatherers on the network;

(b) filtering and aggregating the network communications usage information;

(c) completing a plurality of data records from the filtered and aggregated network communications usage information, the plurality of data records corresponding to network usage by a plurality of users;

(d) storing the plurality of data records in a database;

(e) allowing the selection of one of a plurality of reports for reporting purposes;

(f) submitting queries to the database utilizing the selected reports for retrieving information on the collection of the network usage information from the network devices; and

(g) outputting a report based on the queries.

2. A method as recited in claim 1, and further comprising submitting network activity queries to the database utilizing the selected reports for retrieving information on activity of the network.

6. A method as recited in claim 2, and further comprising generating an alert upon the occurrence of an event.

8. A method as recited in claim 6, wherein the alert indicates that services should be ceased.

13. A computer program product embedded into computer readable medium for reporting on the collection of network usage information from a plurality of network devices, comprising:

(a) computer code for collecting network communications usage information in real-time from a plurality of network devices at a plurality of layers utilizing multiple gatherers each including a plurality of information source modules each interfacing with one of the network devices and capable of communicating using a protocol specific to the network device coupled thereto, the network devices selected from the group consisting of routers, switches, firewalls, authentication servers, web hosts, proxy servers, netflow servers, databases, mail servers, RADIUS servers, and domain name servers, the gatherers being positioned on a segment of the network on which the network devices coupled thereto are posi-

tioned for minimizing an impact of the gatherers on the network;

(b) computer code for filtering and aggregating the network communications usage information;

(c) computer code for completing a plurality of data records from the filtered and aggregated network communications usage information, the plurality of data records corresponding to network usage by a plurality of users;

(d) computer code for storing the plurality of data records in a database;

(e) computer code for allowing the selection of one of a plurality of reports for reporting purposes;

(f) computer code for submitting queries to the database utilizing the selected reports for retrieving information on the collection of the network usage information from the network devices; and

(g) computer code for outputting a report based on the queries.

The asserted '510 Patent claims recite:

16. A computer program product stored in a computer readable medium for reporting on a collection of network usage information from a plurality of network devices, comprising:

computer code for collecting network communications usage information in real-time from a plurality of network devices at a plurality of layers;

computer code for filtering and aggregating the network communications usage information;

computer code for completing a plurality of data records from the filtered and aggregated network communications usage information, the plurality of data records corresponding to network usage by a plurality of users;

computer code for storing the plurality of data records in a database;

computer code for submitting queries to the database utilizing predetermined reports for retrieving information on the collection of the network usage information from the network devices; and

computer code for outputting a report based on the queries;

wherein resource consumption queries are submitted to the database utilizing the reports for retrieving information on resource consumption in a network; and

wherein a resource consumption report is outputted based on the resource consumption queries.

17. A computer program product as recited in claim 16, and further comprising computer code for submitting network activity queries to the database utilizing the reports for retrieving information on the activity of the network.

19. A computer program product as recited in claim 16, and further comprising computer code for generating an alert upon occurrence of an event.

These 8 asserted claims of the '984 and '510 Patents can be generalized as:

- "collecting network communications usage information in real-time from a plurality of network devices;"

- "filtering and aggregating the network communications usage information;"

- "completing a plurality of data records from the filtered and aggregated network communications usage information, the plurality of data records corresponding to network usage by a plurality of users;"

- "storing the plurality of data records in a database;" and

- "outputting a report based on the queries" of database information.

### D.  The '797 Patent

Finally, "[t]he '797 patent has a different focus than the other three patents-in-suit, by concentrating on the structure of the DRs." *District Court Op.* at *4. Amdocs asserts independent claims 1, 7, and 19 and dependent claims 2 and 8.

The asserted claims recite:

1. A method for generating a single record reflecting multiple services for accounting purposes, comprising:

> (a) identifying a plurality of services carried out over a network;

> (b) collecting data describing the plurality of services; and

> (c) generating a single record including the collected data, wherein the single record represents each of the plurality of services.

2. The method as recited in claim 1, and further comprising sending the single record to a Business Support System.

7. A computer program product embedded into computer readable medium for generating a single record reflecting multiple services for accounting purposes, comprising:

> (a) computer code for identifying a plurality of services carried out over a network;

> (b) computer code for collecting data describing the plurality of services; and

> (c) computer code for generating a single record including the collected data, wherein the single record represents each of the plurality of services;

wherein the services include at least two services selected from a group consisting of a hypertext transfer protocol (HTTP) session, an electronic mail session, a multimedia streaming session, a voice over Internet Protocol (IP) session, a data communication session, an instant messaging session, a peer-to-peer network application session, a file transfer protocol (FTP) session, and a telnet session;

wherein the data is collected utilizing an enhancement procedure defined utilizing a graphic user interface by

> listing a plurality of available functions to be applied in real-time prior to end-user reporting,

allowing a user to choose at least one of a plurality of fields, and

allowing the user to choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting.

8. The computer program product as recited in claim 7, and further comprising computer code for sending the single record to a Business Support System.

19. A method for generating a single record reflecting multiple services, comprising:

(a) collecting data with different formats describing a plurality of services, wherein the services are selected from the group consisting of an hypertext transfer protocol (HTTP) session, electronic mail session, a multimedia streaming session, and voice over Internet Protocol (IP) session;

(b) collecting data with different formats describing users of the services;

(c) generating a single record including the collected data representing each of the services and the users;

(d) collecting a plurality of the single records;

(e) generating a distinct record including the collected data of each of the single records, wherein the distinct record represents each of the plurality of single records; and

(f) sending the distinct record to a Business Support System.

For purposes of this appeal, these 5 asserted claims can be generalized as:

- "generating a single record" of data about service use on a network;

- where the record "represent[s] each of the . . . services."

### E.  The Accused Product

As noted, Amdocs and Openet compete in the market for "data mediation software," which collects, processes, and compiles network records so that network usage can be tracked and billed appropriately.  The accused product is Openet's FusionWorks Framework ("Framework"), which it refers to as its "mediation operating system." The Framework is essentially a package of tools, one of which is mediation, provided to customers on an Installation CD.  The parties disagree regarding the structure and function of the Framework, including the location of the allegedly infringing code.

According to Openet, the Framework will not perform mediation "without required additional custom software," referred to as "business logic rules" or DataStream Decoder ("DSD") scripts.  The DSD scripts are not contained on the Installation CD and must be added later.  Openet argues that the Correlation and Transaction Engines ("CTEs") in the Framework "only operate[] according to business logic rules (DSD scripts) that have been written to instruct a particular CTE how to process collected data."  Openet does admit that the Framework, once operating, collects network records from throughout an ISP's network and processes them before generating records that the ISP can use to produce bills for its customers.

Amdocs argues that the complete software code for the mediation aspects of the Framework is on the Installation CD.  While Amdocs agrees that the CTEs are "rules

driven," it asserts that "all of the computer code for recognizing and performing each pre-defined rule is present on the Framework installation CD at the time Openet delivers it to the customer." Amdocs argues that the DSD scripts cannot alter the code already present on the Installation CD. For support, Amdocs points to Openet marketing materials and user guides that describe the operation of the Framework, including details regarding the location and operation of the CTEs.[2] This evidence generally describes how the Framework collects, correlates, enriches, and aggregates networks records.

### F. Course of the Proceedings Below

On August 16, 2010, Amdocs asserted the '797 and '065 Patents against Openet in the Eastern District of Virginia. Counts of infringement of the '984 and '510 Patents were subsequently added on February 3, 2011.

The district court held combined claim construction and summary judgment proceedings. The parties disagreed about the meaning of the claim terms "enhance," "enhancement," "completing," and "single record represent[ing] each of a plurality of services." In addition, Openet moved for summary judgment of invalidity and noninfringement and Amdocs moved for summary judgment that it had not committed inequitable conduct.

The district court held an initial hearing regarding these motions on July 8, 2011, but did not extensively discuss the substance of claim construction or summary judgment. The court appeared partially frustrated by the lack of clarity of the presentation of the case and, as such, cancelled the trial that was scheduled for later that month. In its place, the district court held a summary

---

[2] The description of the operation of the Framework herein is limited in detail due to the confidential nature of the exhibits upon which Amdocs relies.

judgment hearing on July 25, 2011, where it addressed claim construction and the summary judgment motions at length.  On September 27, 2012, the court issued an order granting Openet's motion for summary judgment of non-infringement for all asserted claims and granting Amdocs' motion regarding inequitable conduct.  The court did not issue an opinion explaining the bases for its decisions until January 22, 2013.

In its January opinion, the court construed the claim terms noted above and, based upon those constructions, found that Openet did not infringe.  Although neither party argued about whether enhancement occurred in a distributed fashion in the briefing or at oral argument, the district court construed "enhance" as "to apply a number of field enhancements in a distributed fashion." *District Court Op.* at \*20.  The court also clarified that "in a distributed fashion" meant that the enhancement occurred "close to the source" where the network usage information is collected.  *Id.* at \*21.  The court next construed "completing" to mean "enhance a record until all required fields have been populated." *Id.* at \*23.

Because neither party argued whether enhancement occurred in a distributed fashion, the court had no briefing or argument on whether the accused products infringed under this claim interpretation.  Despite this, the district court found that there were no genuine issues of material fact regarding whether Openet's products "enhance" network records "in a distributed fashion."  Accordingly, the court granted summary judgment of non-infringement for the '984, '510, and '065 Patents.

Regarding the '797 Patent, the district court construed a "single record represent[ing] each of a plurality of services" as "one record that includes customer usage data for each of the plurality of services used by the customer on the network." *Id.* at \*25.  The district court concluded that, as a matter of law, the aggregate record

produced by Openet's products did not meet this limitation.

Amdocs timely appeals, and we have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II.  THE LAW

A district court's claim construction is reviewed without deference.  *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276-77 (Fed. Cir. 2014) (en banc); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451 (Fed. Cir. 1998) (en banc).

We apply the law of the regional circuit when reviewing summary judgment decisions.  *See Lexion Med., LLC v. Northgate Techs., LLC, Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011).    The Fourth Circuit reviews "the district court's grant of a motion for summary judgment *de novo*." *Nguyen v. CNA Corp.*, 44 F.3d 234, 236-37 (4th Cir. 1995) (internal citations omitted).  As such, we only affirm if there is no genuine dispute as to an issue of material fact, and the moving party is entitled to summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Further, "when reviewing a motion for summary judgment, we must draw any inferences in the light most favorable to the non-movant."  *Ramos v. S. Maryland Elec. Co-op., Inc.*, 996 F.2d 52, 53 (4th Cir. 1993).  The inquiry of "[i]nfringement, either literal or under the doctrine of equivalents, is a question of fact."  *Brilliant Instruments, Inc., v. GuideTech, LLC*, 707 F.3d 1342, 1344 (Fed. Cir. 2013).

## III. CLAIM CONSTRUCTION ISSUES

The district court made three claim constructions. First, all asserted claims of the '065 Patent require the use of accounting information to "enhance" a network accounting record. The district court construed "enhance" to mean "to apply a number of field enhancements in a

distributed fashion." *District Court Op.* at \*20. The court further clarified that "[i]n this context, 'distributed' means that the network usage records are processed close to their sources before being transmitted to a centralized manager." *Id.* at \*10.

Second, the district court construed "completing" in the asserted '510 and '984 Patent claims to mean to "enhance a record until all required fields have been populated," incorporating its construction of "enhance." *Id.* at \*23.

Third, common to all asserted '797 Patent claims is the limitation of "single record represent[ing] each of the plurality of services." The district court construed the term to mean "one record that includes customer usage data for each of the plurality of services used by the customer on the network," with the understanding that the term does not encompass a record that aggregates usage data. *Id.* at \*25.

Amdocs challenges the first and third of these claim constructions. We affirm the district court's construction of "enhance" in the '065 Patent and also the construction of "completing" in the '510 and '984 Patents, to the extent that it incorporates the construction of "enhance." We vacate and modify the district court's construction of "single record represent[ing] each of the plurality of services" in the '797 Patent.

A.   Construction of "Enhance" in the '065 Patent Claims and "Completing" in the '510 and '984 Patent Claims

In the district court, Amdocs urged that the term "enhance" be construed in accordance with its plain meaning. Amdocs continues to press its plain meaning argument that "enhance" is "to add information to or modify information in a record." Openet argues that "enhance" is indefinite if given a plain meaning construction, and

points to portions of the specification in support of the district court's conclusions.

We agree with the district court. The chief problem with Amdocs' position is that there is no suggestion within the specification of centralized, as opposed to distributed, enhancement. The specification of the '065 Patent repeatedly refers to the "gatherers" as the situs of the enhancement:[3]

- 7:51-57 ("Typically, data collected from a single source does not contain all the information needed for billing and accounting . . . . In such cases, the data is enhanced. By combining IP session data from multiple sources, . . . the gatherers create meaningful session records tailored to the NSP's specific requirements.");

- 10:45-50 ("D. Data Enhancement

  As mentioned above, the gatherers 220 provide data enhancement features to complete information received from the ISMs 210."); and

- Figure 2



---

[3] Amdocs itself tacitly admits that the gatherers perform the enhancement.

In turn, the specification of the '065 Patent distinguishes the gatherers from the Central Event Manager, which "acts as the central nervous system of the system 100, providing centralized, efficient management and controls of the gatherers and the ISMs." '065 Patent 8:12-16. The distributed nature of the gatherers is made clear by the specification:

- 7:7-8 ("Thus, the gatherers act as a distributed filtering and aggregation system. The distributed data filtering and aggregation eliminates capacity bottlenecks improving the scalability and efficiency of the system 100 by reducing the volume of data sent on the network to the CEM 170."); and

- Figure 1



Amdocs argues that including "in a distributed fashion" in the construction of "enhance" is an impermissible importation of limitations from the specification into the claims. But as both the district court and Openet point out, the specification repeatedly recites the advantages of distributed enhancement. For example, the specification states that, "[i]mportantly, the distributed data gathering, filtering, and enhancements performed in the system

enables load distribution." '065 Patent 4:33-35. The district court properly concluded that the embodiments define the outer limits of the claim term and did not err in reading the "in a distributed fashion" and the "close to the source" of network information requirements into the term "enhance."

We therefore affirm the district court's construction of "enhance" as "to apply a number of field enhancements in a distributed fashion."

All asserted claims of the '510 and '984 Patents recite "completing a plurality of data records from the filtered and aggregated network communications usage information, the plurality of data records corresponding to network usage by a plurality of users." The district court construed the term "completing" to mean "enhance a record until all required fields have been populated," incorporating its construction of "enhance" in the '065 Patent to mean "to apply a number of field enhancements in a distributed fashion." *District Court Op.* at \*23. Amdocs does not challenge the district court's construction of "completing," but protests the inclusion of "in a distributed fashion" from the construction of "enhance." Because the district court's construction of "enhance" is correct, we affirm its construction of "completing."

B.   Construction of "Single Record Represent[ing] Each of the Plurality of Services" in the '797 Patent Claims

Common to the asserted '797 Patent claims is the limitation of "single record represent[ing] each of the plurality of services." The district court construed the term to mean "one record that includes customer usage data for each of the plurality of services used by the customer on the network." *Id.* at \*25. It understood the term to not encompass a record that aggregates usage data.

Amdocs argues that "[t]he plain language of the claims is . . . broad enough to cover both (1) a single record

in which usage data for each of a plurality of services is separately represented, and (2) a single record in which usage data for each of a plurality of services is represented in the aggregate."

Openet takes a position similar to that of the district court, arguing that the "'797 patent requires separately recording [collected] data." Both the district court and Openet rely on Figure 6 of the specification, where different services are listed separately:



The core dispute here is over the meaning of the term "represent." While the specification does not discuss representation of a plurality of services, it does teach the representation of a plurality of records:

> As shown in FIG. 7, a plurality of the records 702 may be collected and grouped, where each group of records relates to the usage of a specific type of service, e.g. web surfing, e-mail, voice over IP calls, and multimedia streaming, etc. The records 702 may reflect the usage of any granularity required for billing of a BSS. Thereafter, tables 703 may be employed to identify customers who received the services identified in the records 702. This may be accomplished by correlating an IP address with user identifiers, users' location information, company identifiers, or any other desired method.
>
> Thereafter, separate records 704 may be generated based upon correlating a plurality of records 702 and information contained in tables 703. How the correlation is performed may depend on the billing requirements of a BSS. Such separate records 704 may include a company identifier and

> usage data associated with one particular service. *As such, the separate record 704 may represent each of the plurality of records 702.*

'797 Patent 4:28-32 (emphasis added).  In turn, Figure 7 shows clearly that the separate records 704 can represent the records 702 by aggregation, explicitly using the words "aggregated . . . records."

Because the specification shows that the separate record can represent a plurality of records by aggregation, the ordinary artisan would also understand that a separate record can represent a plurality of services by aggregation.  Accordingly, we vacate the district court's construction of "single record represent[ing] each of the plurality of services" and substitute it with a plain meaning interpretation.

## IV. INFRINGEMENT ANALYSIS

### A.  The '065, '510, and '984 Patent Claims

Based upon its decision that enhancement occurs "in a distributed fashion" and "close to the source" of the network account information, the district court determined that there was "no evidence" of infringement and granted summary judgment in Openet's favor.  We disagree.  Contrary to Openet's argument, Amdocs need not point to the specific location of the allegedly infringing code to overcome summary judgment.  We hold that Amdocs' documentary evidence describing the structure and operation of the accused products creates genuine factual issues regarding whether the products enhance "in a distributed fashion" "close to the source" of the network information.

Amdocs' documentary evidence of infringement includes: marketing presentations and user guides describing the Framework and its operation; citations to source code present on the Installation CD; and citations to DSD scripts.  The district court concluded that this evidence did not create a genuine issue of material fact regarding

enhancement. First, the court found that two of Openet's marketing presentations were irrelevant to the infringement analysis because Openet prepared these presentations for foreign entities. The court reasoned that, because there can be no infringement based upon activities entirely outside the United States, these presentations could not "constitute evidence of actionable infringement." *District Court Op.* at *20. Next, the court dismissed Amdocs' citations to allegedly infringing source code on the Installation CD because "the record shows that the cited source code is inoperable without DSD scripts" and the Framework is sold without DSD scripts. *Id.* at *21. The court also dismissed Amdocs' citation to DSD scripts because it was unaccompanied by expert testimony and because Openet produced expert testimony in opposition.

According to the court, the remaining marketing materials proffered by Amdocs demonstrated that the FusionWorks system does not enhance in a distributed fashion. Rather, the court concluded that the Framework functions as a "pipeline" and utilizes a separate, central processing system (i.e., a single CTE) to enhance data records. Based upon this understanding of the Framework, the court found that the products did not enhance in a distributed fashion because "Openet products do not have the requisite 'hub and spoke' architecture; instead, all events are passed to the CTE, a separate processing system." *Id.*

The district court erred in granting summary judgment to Openet because it improperly deemed Amdocs' foreign presentations irrelevant, incorrectly focused on proof regarding DSD scripts, and failed to make all reasonable inferences supported by the record in favor of Amdocs and, instead, resolved disputed factual issues in Openet's favor.

The district court first erred when it found that the marketing materials presented to foreign entities were irrelevant.  While it is true that there can be no infringement of a U.S. patent for solely extra-territorial activities, this does not mean that Openet's description of how the Framework functions is irrelevant simply because it was presented to a foreign entity.  Indeed, Openet admits that the Framework described in these marketing materials is the same product that is made and sold in the United States.  Thus, the description of the Framework in these materials is relevant to the extent that it sheds light on whether the Framework enhances "in a distributed fashion."

The district court next erred by discounting Amdocs' citations to source code on the FusionWorks installation CD simply because Openet asserts that the Framework is "inoperable without DSD scripts."  *Id.*  Even assuming that the Framework does not "operate" without DSD scripts, genuine factual disputes remain regarding enhancement.  Simply because a product will not "operate" in a certain condition does not mean that it does not infringe in that condition.[4]  Here, the Framework may not operate without DSD scripts (or, indeed, without a computer or electricity) but making, using, or selling the installation CD may still, as a factual matter, infringe the asserted claims.  This is essentially Amdocs' position.  Amdocs argues that the complete software code for the FusionWorks Framework is on the installation CD.  While Amdocs agrees that the CTEs are "rules driven," it asserts that "all of the computer code for recognizing and performing each pre-defined rule is present on the Fusion-Works installation CD at the time Openet delivers it to

---

[4]    For example, a product may not operate without electricity, or without a user to operate it, but making and selling such a product may still infringe a product patent.

the customer." Amdocs notes that the DSD scripts cannot alter the code already present on the installation CD and argues that the DSD scripts only "configure" or "activate" computer code already present on the CD. Openet responds that Amdocs cannot prove infringement unless it analyzes DSD scripts and identifies those that perform the claim limitations. Openet argues that Amdocs has not performed this analysis and that, therefore, all of its infringement allegations fail as a matter of law.

In essence, the parties dispute whether the allegedly infringing code is located only on the installation CD (Amdocs' position) or whether some of the code is contained in the DSD scripts (Openet's position). The district court improperly decided this disputed factual question in Openet's favor by discounting Amdocs' citation to the code present on the CD and requiring Amdocs to proffer expert evidence related to the DSD scripts. On remand, the location of the allegedly infringing code (on the CD, within the DSD scripts, or perhaps some combination) may well need to be resolved to establish infringement. At summary judgment, however, the fact that the parties dispute the code's location does not mean, as Openet contends, that Amdocs cannot prove infringement as a matter of law. To the contrary, Amdocs is entitled to establish genuine factual issues by relying upon its documentary evidence, without necessarily identifying the precise location of the allegedly infringing code.

Upon review of this documentary evidence, we find that it sufficiently describes the Framework's function to create a genuine issue of material fact regarding enhancement. In particular, the evidence (including the evidence the district court found irrelevant) establishes genuine factual issues regarding the location and operation of the CTEs in the FusionWorks system. As noted, the district court concluded that the Framework includes a single CTE that stores and processes all network records at a remote location from where they are collected.

To the contrary, it is undisputed that the accused products may utilize multiple CTEs. The court also relied, in part, upon its conclusion that the accused system does not generate output records "close to the source" of the network information. But the court's claim construction requires only *enhancement* to occur "close to the source" of the network records. The *generation* of an output record occurs after enhancement and may happen away from the source of network records under the court's construction.

The court also improperly concluded that all network records are stored in a central data repository at the CTE before being enhanced. While there is evidence that the Framework sometimes stores network records, there is also ample evidence suggesting that this is an optional mode of operation. For example, the statements relied upon by the court refer to temporarily storing data before it is "aggregated," "correlated," and "consolidated" into an output record. Contrary to the court's conclusion, the statements do not refer to storing data before *enhancement*. It would be reasonable to infer, given the other evidence on record, that enhancement takes place before the storage and generation of an output record. Indeed, Openet's marketing materials repeatedly emphasize that the network records can be collected and processed in "real time," which would suggest a single, central storage repository is not used because it would delay enhancement. In sum, while we cannot recount all the confidential details here, there is ample evidence on record to create a genuine issue of material fact regarding whether the CTEs are distributed throughout the Framework system and operate in a distributed manner.

Based upon the foregoing, we reverse the court's grant of summary judgment because it incorrectly deemed certain evidence irrelevant, improperly required Amdocs to focus on DSD scripts, and improperly resolved disputed factual issues against Amdocs.

## B. The '797 Patent Claims

As discussed above, we have corrected the district court's erroneous construction of "single record represent[ing] each of the plurality of services" with a plain meaning construction. We therefore also vacate the summary judgment of noninfringement of the '797 Patent claims and remand for a determination of infringement in the first instance.

CONCLUSION

**AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED**

COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**AMDOCS (ISRAEL) LIMITED,**
*Plaintiff-Appellant,*

**v.**

**OPENET TELECOM, INC., AND
OPENET TELECOM LTD.,**
*Defendants-Appellees.*

---

2013-1212

---

Appeal from the United States District Court for the Eastern District of Virginia in No. 10-CV-0910, Judge Leonie M. Brinkema.

---

NEWMAN, *Circuit Judge,* concurring in part, dissenting in part.

I concur in my colleagues' rulings as to the district court's claim construction and rulings as to the '065, '510, and '984 patents. However, I would affirm the judgment of noninfringement of the '797 patent, for the reasons given by the district court. To the extent that the panel majority holds otherwise, I respectfully dissent.